Enclosed herewith are signed copies of the following filings to cure the noted defects:

1. Docket Entry #10 (filed 03/30/2026) — PLAINTIFF'S OPPOSITION TO DEFENDANT KRYSCIO'S MOTION TO DISMISS re ECF No. 6. A signed original is enclosed herewith.

2. Docket Entry #15 (filed 03/30/2026) — BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL FOR MINOR CHILDREN. A signed original is enclosed herewith.

## II. NOTICE OF VOLUNTARY WITHDRAWAL — DOCKET ENTRY #13

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), the Plaintiff hereby voluntarily withdraws the following filing:

Docket Entry #13 (filed 03/30/2026) — PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, together with the associated Proposed Order (Attachments: #1 Proposed Order).

The Plaintiff does not seek to refile this motion at this time. The Plaintiff respectfully requests that the Clerk note this voluntary withdrawal on the docket.

## III. REQUEST

The Plaintiff respectfully requests that the Clerk:

(a) Accept the enclosed signed copies of Docket Entries #10 and #15 to cure the noted defects;

(b) Note on the docket that the defects for Docket Entries #10 and #15 have been cured; and

(c) Note the voluntary withdrawal of Docket Entry #13 (Plaintiff's Motion for Preliminary Injunction) on the docket.

Thank you for your attention to this matter. I apologize for the inconvenience caused by the unsigned filings.


Respectfully submitted,

_____

Brandon Aaron Burr
Plaintiff, *Pro Se*
Newport News, Virginia
Telephone: (941) 962-8144
Email: 2brandonb@gmail.com

---

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of April, 2026, a true and accurate copy of this

Letter to the Clerk of Court, together with the enclosed signed filings, was served upon the

following by United States mail, first-class, postage prepaid, and electronic mail:

James A. Cales III, Esquire

Furniss, Davis, Rashkind & Saunders, P.C.

6160 Kempsville Circle, Smithfield Building

Suite 341B

Norfolk, Virginia 23502

_____

Brandon Aaron Burr
Plaintiff, *Pro Se*

---

## ENCLOSURES:

1. Signed copy of Docket Entry #10 — Plaintiff's Opposition to Defendant Kryscio's Motion to Dismiss re ECF No. 6

2. Signed copy of Docket Entry #15 — Brief in Support of Plaintiff's Motion for Appointment of Counsel for Minor Children

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

BRANDON AARON BURR,

Plaintiff,

v.                                    CIVIL ACTION NO. 4:26cv37

KATHRYN KRYSCIO, et al.,

Defendants.

---

**PLAINTIFF'S OPPOSITION TO**

**DEFENDANT KRYSCIO'S MOTION TO DISMISS**

---

1

# INTRODUCTION

Defendant Kathryn Kryscio asks this Court to dismiss claims arising from a conspiracy that stripped a father of all meaningful contact with his children for nearly three years—a conspiracy now confirmed by the admission of the very Guardian ad Litem ("GAL") appointed to protect those children. On February 28, 2026, GAL Thomas Atkins admitted to Plaintiff in the presence of a witness that the custody case was "rigged against dad." Second Amended Complaint ("SAC") ¶¶ 1, 71–74. Thirteen days later, Plaintiff's own attorney, Katherine Meixel, withdrew from representing him. SAC ¶ 77. The simultaneous removal of Plaintiff's counsel—at the very moment the conspiracy was being exposed—is consistent with a coordinated effort to leave Plaintiff unrepresented and unable to act on what Atkins had revealed. And two days before Kryscio filed her Motion to Dismiss, the state court judge overseeing the underlying custody case recused himself under Canon 1(D) of the Virginia Canons of Judicial Conduct for actual impropriety or the appearance thereof, vacating his own March 23, 2026 order. SAC ¶¶ 80–84.

Kryscio's brief mentions none of this. Filed on March 27, 2026—two days after Judge Hoffman's extraordinary recusal—her memorandum presents a sanitized version of events that omits the most material recent developments in this case. She argues that Plaintiff's claims are barred by the Rooker-Feldman doctrine, the statute of limitations, and failure to state a claim. Each argument fails on the law and the facts.

2

This is not a case about a disappointed litigant seeking to relitigate a custody outcome. This is a case about a coordinated conspiracy among a court-appointed GAL with five Virginia State Bar disciplinary actions, a mother who obstructed even court-ordered visitation, and a state court judge who ultimately acknowledged his own impropriety—a conspiracy that deprived Plaintiff of his fundamental constitutional right to the care and custody of his children. The Second Amended Complaint pleads detailed, specific facts that satisfy the plausibility standard of *Ashcroft v. Iqbal*, 556 U.S. 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and Kryscio's motion should be denied.

## RELEVANT FACTS

Because Kryscio's brief omits facts critical to this Court's analysis, Plaintiff sets forth the relevant factual background in full. At this stage, all well-pled facts must be accepted as true and all reasonable inferences drawn in Plaintiff's favor. *Iqbal*, 556 U.S. at 678; *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

### A. The Custody Proceedings and Appointment of GAL Atkins

Plaintiff Brandon Aaron Burr and Defendant Kathryn Kryscio are the parents of minor children who were the subject of custody proceedings in the Newport News Circuit Court, Case No. CL1801756F-15. SAC ¶¶ 10–15. Thomas Atkins was appointed as Guardian ad Litem to represent the children's interests. SAC ¶ 20. This appointment made Atkins a state actor exercising authority delegated by the Commonwealth of Virginia and the Circuit Court, with the

3

power to investigate, make recommendations, and advocate positions that the court relied upon in making custody determinations. SAC ¶¶ 21–23.

From the outset, Atkins's conduct as GAL was marked by systemic bias against Plaintiff. He consistently aligned his recommendations with Kryscio's litigation positions, failed to investigate documents that Plaintiff alleged were manufactured, and recommended outcomes that resulted in the near-total elimination of Plaintiff's contact with his children. SAC ¶¶ 30–45. Six independent psychological evaluations—conducted by licensed professionals over a period of years—found Plaintiff posed no danger to his children and was a fit parent. SAC ¶¶ 46–48. The children's own therapist recommended reunification therapy and increased visitation, concluding that the children's well-being required a meaningful relationship with their father. SAC ¶ 49. Yet Atkins recommended, and the court adopted, increasingly restrictive visitation schedules that bore no rational relationship to the evidence before the court. This pattern is not explainable by legitimate professional disagreement; it is consistent only with the coordinated scheme Plaintiff alleges.

Atkins's own November 11, 2022 GAL Report—submitted to the Newport News Circuit Court at 11:53 PM as a self-described "Draft"—provides documentary proof of the irreconcilable contradiction between Atkins's stated positions and the outcomes he produced. In that report, Atkins wrote:

> I ALWAYS advocated, in Every conversation and in Every Testimony that I was offered, that I, In-No-Way, celebrate and/or advocate for ANY Father's, (Parent's) Non-Contact with their children.

Atkins's November 11, 2022 GAL Report. He further stated that "Burr's Counsel and myself, post our-representations, yielded, at each/every hearing, for some-time, MORE TIME for Mr. Burr with his children, to the Complete Dismay of Mother's Counsel." *Id.* Yet despite this claimed advocacy, the outcome of Atkins's tenure as GAL was the near-total elimination of Plaintiff's contact with his children for 1,034 days. If Atkins was truly "ALWAYS" advocating for Plaintiff's visitation, how did the result become zero contact? Either Atkins's claimed advocacy was a facade masking coordinated action against Plaintiff, or the proceedings were so compromised that even his stated recommendations were overridden. Either interpretation supports the conspiracy Plaintiff alleges—and Atkins's own February 28, 2026 admission that the case was "rigged against dad" confirms the former.

The same GAL Report further confirmed that Atkins found Plaintiff's home to be appropriate for the children. Atkins wrote that he "made a very-positive visit to Mr. Burr's home" and "affirmed the appropriateness of the home as well as the fact that I confirmed that Mr. Burr, indeed, had Any/All Items & Elements that he said he had for the boys and I Affirmed Such, In Court." Atkins's November 11, 2022 GAL Report. Atkins further stated that "Brandon & Helene had worked and were working very hard to make a home for the Boys and Themselves and I reported, truthfully, at the time, that I believed Helene was a positive and regulating influence on Mr. Burr." *Id.* Yet despite these affirmative findings—an appropriate home, a positive partner, adequate provisions for the children—the ultimate result was zero visitation. The disconnect between Atkins's own documented findings and the custody outcomes is powerful evidence that the process, not the merits, determined the result.

## B. The Elimination of Parental Contact

From December 2021 through October 2024—a period of nearly three years—Plaintiff had zero contact with his children. SAC ¶¶ 50–55. No phone calls. No letters. No visits. A complete severance of the parent-child bond for 1,034 days. This de facto termination of parental rights occurred without the procedural protections the Fourteenth Amendment requires before the state severs the parent-child relationship. See *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982) (requiring clear and convincing evidence before parental rights may be terminated). Here, not only was there no clear and convincing evidence—six evaluations affirmatively established Plaintiff's fitness.

When minimal visitation was finally restored, the February 10, 2025 final order restricted Plaintiff to just forty-five minutes per week of supervised visitation—a fraction of what even the children's therapist had recommended. SAC ¶ 56. For a parent found safe by every evaluator, forty-five supervised minutes per week is not a custody arrangement; it is a punishment without a finding of wrongdoing.

Even this minimal court-ordered visitation was not honored. Beginning in May 2025 and continuing to the present, Kryscio has systematically obstructed Plaintiff's exercise of his court-ordered visitation rights, canceling sessions, arriving late, manufacturing pretextual conflicts, and otherwise ensuring that Plaintiff could not enjoy even the token contact the court had permitted. SAC ¶¶ 57–62. This ongoing obstruction constitutes both an independent constitutional injury and a continuing overt act in furtherance of the conspiracy.

6

## C. The Conspiracy Revealed

On February 28, 2026, GAL Thomas Atkins made a direct admission to Plaintiff that the custody case was "rigged against dad." SAC ¶¶ 71–74. This statement was made in the presence of a witness, Heleille Soleille, and may also be corroborated by surveillance footage from the Harris Teeter store at 12404 Warwick Blvd, Newport News, Virginia, where the admission was made. SAC ¶ 75. Plaintiff served a formal litigation hold notice on Harris Teeter on March 18, 2026, demanding preservation of all interior and exterior surveillance footage from February 28, 2026. See Plaintiff's Preservation Letter to Harris Teeter (March 18, 2026). This admission is not "speculation" or "guesswork"—it is a direct statement by a participant in the conspiracy acknowledging that the proceedings were manipulated against Plaintiff. It is an admission against interest by a party whose professional reputation and liberty depend on the proceedings having been fair. The import of this statement cannot be overstated: the court-appointed officer charged with protecting the children's interests admitted that the case was fixed.

Thirteen days after this admission, on March 13, 2026, Plaintiff's own attorney, Katherine Meixel, withdrew from representing him. SAC ¶ 77. The timing is devastating to Kryscio's position. Ms. Meixel's withdrawal came at the precise moment when Atkins's "rigged" admission had exposed the conspiracy—leaving Plaintiff without counsel at the most critical juncture of the litigation. Whether Ms. Meixel's withdrawal was itself coordinated with the other conspirators or simply the product of an attorney recognizing the scope of corruption

7

she could no longer navigate, the effect was the same: Plaintiff was stripped of legal representation just as the conspiracy was unraveling. SAC ¶¶ 77, 79.

### D. Judge Hoffman's Recusal and the Corruption of the Process

On March 25, 2026—two days before Kryscio filed her Motion to Dismiss—Judge Christopher Hoffman recused himself from the underlying state court case under Canon 1(D) of the Virginia Canons of Judicial Conduct, which addresses actual impropriety or the appearance of impropriety. SAC ¶¶ 80–84. In connection with the recusal, Judge Hoffman vacated his own March 23, 2026 order. *Id.* A sitting judge's self-recusal for actual impropriety—and the vacatur of his own order—is an extraordinary event with no innocent explanation that is consistent with the regularity of the proceedings Kryscio claims characterized this case. It confirms that the judicial process in the underlying case was corrupted, precisely as Plaintiff alleges.

Kryscio's Motion to Dismiss was filed March 27, 2026—two days after the recusal. Remarkably, her brief makes absolutely no mention of the recusal, the vacatur, or Canon 1(D). This omission is not an oversight; it is a strategic decision to withhold from this Court a fact that is devastating to every argument Kryscio advances. The recusal undermines her claim that the state court proceedings were legitimate (Rooker-Feldman); it constitutes a recent event well within any limitations period (statute of limitations); and it powerfully corroborates the conspiracy allegations (§§ 1983 and 1985). This Court should consider Kryscio's silence on the recusal when evaluating the credibility of her arguments.

**E. Atkins's Disciplinary History and Unprofessional Conduct**

GAL Thomas Atkins has been the subject of five Virginia State Bar disciplinary actions, occurring in 2019, 2022, 2024, and 2025, with four additional dockets scheduled for hearing in April 2026. SAC ¶¶ 25–29. This extensive disciplinary history—spanning the entirety of the relevant time period—demonstrates that Atkins is not a competent professional whose recommendations should be taken at face value. It is further evidence that his conduct in this case was not mere professional negligence but part of a pattern of ethical violations consistent with the conspiracy alleged. The Virginia State Bar does not impose five disciplinary actions on attorneys who are merely imperfect; it imposes them on attorneys who repeatedly violate their professional obligations.

Atkins's November 11, 2022 GAL Report is itself a striking exhibit of the unprofessional conduct consistent with his disciplinary record. Atkins submitted the report to the Court at 11:53 PM, acknowledging it was a "Draft": "Well, It Is Midnight and This is a Draft, which I Offer as, Hopefully, in a Form, Acceptable to the Court." Atkins's November 11, 2022 GAL Report. Far from a neutral, professional assessment of the children's best interests, the report is replete with personal attacks, financial threats against Plaintiff, and amateur psychological diagnoses—conduct that falls far outside the proper role of a Guardian ad Litem.

Most alarmingly, Atkins used the GAL Report to threaten to seize Plaintiff's home. Atkins wrote: "I am, Still Accruing Fees in these matters, as I write this report and will recoup them from Mr. Burr, when appropriate and will levee against his 'home' and I will own the

'Burr-Boys Beach-House.'" Atkins's November 11, 2022 GAL Report. A court-appointed officer charged with representing children's interests does not threaten to lien a parent's home in a report filed with the court—unless that officer has a personal financial interest adverse to the parent that has overtaken his fiduciary obligations. This threat demonstrates that Atkins was not acting as a neutral advocate for the children; he was acting as an adversary to Plaintiff with a personal financial stake in the outcome.

Atkins further exceeded his role by diagnosing Plaintiff with mental illness in communications to the court. In a follow-up email to the court on November 12, 2022, Atkins wrote that "Father, Seemingly, is descending into some level of unpredictable-madness" and that "Mr. Burr, via his filings/pleadings, has, seemingly, lost-control and/or has had a mental-breakdown/episode." Atkins's November 12, 2022 Follow-Up Email. A Guardian ad Litem is not a mental health professional. Rendering psychiatric diagnoses in communications to the court—particularly when six independent licensed psychological evaluators found Plaintiff safe and fit—is not a legitimate exercise of the GAL's function. It is prejudicial character assassination designed to poison the court's view of Plaintiff, and it is consistent with the pattern of bias that Atkins himself would later acknowledge when he admitted the case was "rigged against dad."

## ARGUMENT

A motion to dismiss under Rule 12(b)(6) must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

Under *Ashcroft v. Iqbal*, 556 U.S. 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Plaintiff's Second Amended Complaint easily clears this threshold.

## I. THE ROOKER-FELDMAN DOCTRINE DOES NOT BAR PLAINTIFF'S CLAIMS.

Kryscio contends that this Court lacks subject-matter jurisdiction under the Rooker-Feldman doctrine because Plaintiff purportedly seeks to "invalidate the decision of the state courts." Def.'s Mem. at 6–8. This argument fundamentally mischaracterizes both the doctrine and Plaintiff's claims.

### 1. The Supreme Court Has Narrowly Confined Rooker-Feldman.

In *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005), the Supreme Court emphatically narrowed the Rooker-Feldman doctrine. The Court held that the doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. The Court warned that the doctrine had been extended "far beyond the

contours of the Rooker and Feldman cases" and made clear that such expansion was improper. *Id.* at 283.

The critical inquiry after *Exxon Mobil* is the source of the injury: does the plaintiff complain of an injury caused by the state-court judgment, or an injury caused by defendant conduct? If the latter, Rooker-Feldman does not apply, even if the claim is related to state court proceedings. The Fourth Circuit has faithfully applied this narrowing. In *Davani v. Virginia Department of Transportation*, 434 F.3d 712 (4th Cir. 2006), the court held that after *Exxon Mobil*, Rooker-Feldman is "narrow" and "confined" and does not bar federal claims that are "independent" of the state court judgment, even if they are related to state court proceedings. *Davani*, 434 F.3d at 719–20. The "inextricably intertwined" formulation, upon which Kryscio's argument necessarily depends, has been "confined to the dustbin" after *Exxon Mobil*. *Id.*

### 2. Plaintiff Challenges a Corrupt Process, Not a Judgment.

Plaintiff does not ask this Court to review or reject the state court's custody determination. Plaintiff does not argue that the state court applied the wrong legal standard, weighed the evidence incorrectly, or reached the wrong result. Rather, Plaintiff challenges the conspiracy that corrupted the process by which that determination was reached. This distinction is dispositive.

The Supreme Court in *Dennis v. Sparks*, 449 U.S. 24 (1980), explicitly held that § 1983 claims challenging a conspiracy to corrupt judicial proceedings are cognizable in federal court.

In *Dennis*, private parties conspired with a state court judge to obtain a favorable injunction through bribery. The Court held that the private coconspirators could be held liable under § 1983 and that the federal action was not barred simply because it implicated a state court judgment. *Id.* at 27–29. The Court reasoned that "[t]o hold otherwise would be to grant private coconspirators immunity from liability under the federal civil rights laws." *Id.* at 28–29.

The parallel to this case is exact. Plaintiff alleges that GAL Atkins (a state actor), Kryscio (a private party), and others conspired to manipulate the custody proceedings to Plaintiff's detriment. SAC ¶¶ 63–70. Atkins himself admitted the case was "rigged." SAC ¶¶ 71–74. Judge Hoffman recused for actual impropriety and vacated his own order. SAC ¶¶ 80–84. These are not allegations about a judgment being wrong; they are allegations about a process being corrupted through a conspiracy between state actors and private parties—precisely the type of claim *Dennis* held cognizable. Rooker-Feldman has no application.

### 3. Plaintiff's Injuries Are Independent of the State Court Judgment.

Even if Rooker-Feldman could theoretically apply to some aspect of this case—which it cannot—many of Plaintiff's injuries are entirely independent of any state court judgment. Kryscio's ongoing obstruction of court-ordered visitation beginning in May 2025 is not an injury "caused by" a state court judgment; it is an injury caused by Kryscio's own defiance of that judgment. SAC ¶¶ 57–62. Atkins's February 28, 2026 admission is not an injury caused by a judgment; it is an independent revelation of an ongoing conspiracy. SAC ¶¶ 71–74. The

13

conspiracy itself—the coordinated effort to deprive Plaintiff of his parental rights through fraud and manipulation—is an injury independent of any particular court order it may have produced.

Kryscio's reliance on *Friedman's Inc. v. Dunlap*, *American Reliable Insurance Co. v. Stillwell*, *Brown & Root v. Breckenridge*, and *Jordahl v. Democratic Party of Virginia* is unavailing. Those cases involved plaintiffs who directly challenged the correctness of state court judgments—who argued, in essence, that the state court got it wrong. Plaintiff here does not challenge the correctness of the custody determination; he challenges the integrity of the process by which it was reached. Every case Kryscio cites predates or fails to account for the Supreme Court's emphatic narrowing in *Exxon Mobil* and the Fourth Circuit's application in *Davani*. Kryscio's Rooker-Feldman argument is without merit.

## II. PLAINTIFF'S CLAIMS ARE TIMELY.

Kryscio argues that Virginia's two-year statute of limitations bars Plaintiff's claims, asserting that Plaintiff had "inquiry notice" as early as November 12, 2022. Def.'s Mem. at 8–10. This argument fails for three independent reasons, any one of which is sufficient to defeat it.

### 1. The Continuing Violation Doctrine Applies.

The conspiracy alleged here did not end in 2022. It continued—and continues to this day—through a series of overt acts extending well into the limitations period:

- The February 10, 2025 final order restricting Plaintiff's visitation to forty-five minutes per week of supervised contact—an order procured through the defendants' conspiracy. SAC ¶ 56.

- Kryscio's obstruction of even this minimal court-ordered visitation, beginning in May 2025 and continuing to the present. SAC ¶¶ 57–62.

- Atkins's February 28, 2026 admission that the case was "rigged against dad." SAC ¶¶ 71–74.

- The withdrawal of Plaintiff's counsel, Katherine Meixel, on March 13, 2026—simultaneous with the exposure of the conspiracy. SAC ¶ 77.

- Judge Hoffman's recusal on March 25, 2026, under Canon 1(D) for actual impropriety or the appearance thereof, and vacatur of his own order. SAC ¶¶ 80–84.

Under the continuing violation doctrine, "[e]ach overt act in furtherance of a conspiracy restarts the limitations period." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Where, as here, the conspiracy involves a continuing pattern of overt acts—the most recent occurring mere days before the filing of Kryscio's own motion—the limitations period is anchored to the most recent act. Each of the above events occurred well within two years of the filing of this action. The continuing violation doctrine renders Plaintiff's claims timely in their entirety.

## 2. The Discovery Rule Defeats Kryscio's Limitations Argument.

Kryscio's argument that Plaintiff had "inquiry notice" in November 2022 conflates suspicion of a GAL's incompetence with knowledge of a multiparty conspiracy. The statute of limitations in § 1983 actions accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action." *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). A plaintiff's filing of a motion to remove a GAL for perceived bias is not equivalent to knowledge that the GAL is participating in a conspiracy with the opposing party, the presiding judge, and others to rig the proceedings.

Plaintiff did not and could not have known the full scope of the conspiracy until Atkins made his "rigged against dad" admission on February 28, 2026. SAC ¶¶ 71–74. Before that date, Plaintiff may have suspected that Atkins was biased or incompetent—but suspecting one person's bias is fundamentally different from knowing of a conspiratorial agreement among multiple actors to manipulate judicial proceedings. The law does not require clairvoyance. It requires that the limitations period run from the point at which the plaintiff knew, or reasonably should have known, of the injury and its cause.

Kryscio asks this Court to hold that a parent who suspects his GAL is biased has thereby discovered a multiparty conspiracy involving the GAL, the opposing parent, and the presiding judge. That is not the law. See *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975) ("[T]he statute of limitations is tolled until the facts which would support a cause of action are apparent or should

be apparent to a person with a reasonable knowledge of the law."). The discovery rule protects plaintiffs who, like Burr, could not have known the true nature and scope of the wrong until it was revealed. Plaintiff filed this federal action within days of the February 28, 2026 admission. His claims are timely.

### 3. Even Under Kryscio's Timeline, Recent Acts Are Timely.

Even if the Court were to accept Kryscio's limitations argument as to events occurring before March 2024—which it should not—the following overt acts all occurred well within the two-year limitations period: the February 10, 2025 final order (SAC ¶ 56); Kryscio's obstruction of visitation beginning May 2025 (SAC ¶¶ 57–62); Atkins's February 28, 2026 admission (SAC ¶¶ 71–74); Meixel's withdrawal as Plaintiff's counsel on March 13, 2026 (SAC ¶ 77); and Judge Hoffman's recusal on March 25, 2026 (SAC ¶¶ 80–84). Each of these events constitutes an overt act in furtherance of the conspiracy and independently gives rise to a timely claim. The statute of limitations provides no basis for dismissal.

## III. PLAINTIFF STATES VALID CLAIMS UNDER 42 U.S.C. § 1983.

Kryscio argues that Plaintiff's § 1983 claims fail because (A) she did not act under color of state law, (B) Plaintiff's due process rights were not violated, and (C) the conspiracy allegations are conclusory. Each argument is meritless.

### A. State Action Is Established Through Two Independent Theories.

Kryscio characterizes herself as merely a "private citizen acting as a litigant" and contends she cannot be held liable under § 1983 because she is not a state actor. Def.'s Mem. at 11–12. This argument ignores two well-established and independently sufficient bases for § 1983 liability.

*First*, the GAL is a state actor. In *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court held that a professional appointed by the state to perform a function that the state is obligated to provide acts under color of state law for purposes of § 1983. The Court established a functional test: the relevant inquiry is whether the state has delegated a public function to the private individual. *Id.* at 54–56. A Guardian ad Litem satisfies this test in every respect. A GAL is appointed by the court pursuant to state statute. He exercises authority delegated by the Commonwealth of Virginia. He performs a function—representing the interests of children in court proceedings—that the state has undertaken to provide. And his recommendations carry the weight of a court-appointed officer, directly influencing judicial outcomes. SAC ¶¶ 21–23.

The Fourth Circuit has recognized this principle. In *Thomas S. v. Morrow*, 781 F.2d 367, 378–79 (4th Cir. 1986), the court found that a guardian acted under color of state law when exercising authority delegated by the court. The court emphasized that the guardian's power derived from state authority and was exercised in a manner that directly affected the constitutional rights of the parties before the court. The same is true of Atkins: his GAL appointment gave him state-delegated authority to investigate, recommend, and advocate—all functions that directly shaped the custody outcome and Plaintiff's constitutional rights.

18

Atkins's own November 11, 2022 GAL Report confirms the breadth of state-delegated authority he exercised. In the report, Atkins enumerated his functions: conducting independent investigations, researching civil, criminal, and social services records, consulting with counsel and parties, meeting with the children, making home visits, attending hearings, preparing and submitting recommendations to the court, and filing "appropriate petitions/motions/made appropriate arguments" on behalf of the children. Atkins's November 11, 2022 GAL Report. These are not the functions of a private advocate; they are the functions of a quasi-judicial officer exercising comprehensive authority delegated by the state. Atkins was an arm of the court, and his report is Exhibit A of the state authority he wielded—authority that he used, as his own admission later confirmed, to rig the proceedings against Plaintiff.

Kryscio's reliance on *Kirtley v. Rainey*, *Meeker v. Kercher*, *Snyder v. Talbot*, and *Serdah v. Edwards* is misplaced. Those cases arise from other circuits and do not bind this Court. Moreover, they are distinguishable on their facts because they involved GALs whose conduct did not involve conspiracy with other state actors or judicial officers. Here, the GAL's own admission of rigging—combined with the judge's subsequent recusal for actual impropriety—establishes a fundamentally different factual posture that none of Kryscio's out-of-circuit authorities contemplated.

Kryscio's analogy to public defenders is equally unavailing. The Supreme Court in *Polk County v. Dodson*, 454 U.S. 312 (1981), held that public defenders do not act under color of state law when making independent professional judgments in the representation of their clients. But a

GAL is not a defense attorney. A GAL does not exercise independent professional judgment in an adversarial capacity; rather, a GAL acts as an arm of the court, conducting investigations and making recommendations that the court relies upon as a neutral officer. The GAL's role is functionally identical to the court's own investigative and fact-finding function, making the public defender analogy inapt.

*Second*, Kryscio is liable as a private coconspirator. Even if Kryscio is a private citizen, *Dennis v. Sparks*, 449 U.S. 24 (1980), establishes that "private persons, jointly engaged with state officials in [a] challenged action, are acting 'under color' of law for purposes of § 1983." *Id.* at 27–28. Kryscio's brief dismissively asserts that *Dennis* applies only to cases of "corruption and bribery." Def.'s Mem. at 12. This is wrong. The Supreme Court's holding is categorical: a private party who conspires with a state actor to deprive a person of constitutional rights acts under color of state law, regardless of whether the conspiracy involves bribery, fraud, or any other form of corrupt agreement. The *Dennis* principle applies with full force to a private party who conspires with a GAL to manipulate custody proceedings, just as it applies to a private party who conspires with a judge through bribery.

The *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), framework confirms this analysis. Under *Lugar*, state action exists when the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and when the defendant "may fairly be said to be a state actor." *Id.* at 937. Court-ordered custody arrangements are quintessentially state action: they are created by state authority, enforced by state power, and supervised by state officials. A

parent's custody rights exist by virtue of state-created legal frameworks, and the deprivation of those rights through corrupted state proceedings satisfies *Lugar*'s requirements. Kryscio's participation in a conspiracy to manipulate this state process renders her a state actor under *Lugar*.

### B. Plaintiff's Due Process Rights Were Violated.

Kryscio's assertion that Plaintiff received "robust and full opportunity for litigation" and that his claims reflect merely "disappointed expectations" (Def.'s Mem. at 12–13) is contradicted by the very facts this Court must accept as true at the 12(b)(6) stage.

The right of a parent to the care and custody of his children is among the most fundamental of constitutional rights. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"). See also *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925). The state may not deprive a parent of this right without fundamentally fair procedures. *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982).

Plaintiff's allegations establish violations of both substantive and procedural due process. As a matter of substantive due process, the conspiracy resulted in the near-total elimination of Plaintiff's parental contact for nearly three years—a de facto termination of parental rights without any finding of unfitness. SAC ¶¶ 50–55. Six clean psychological evaluations found

21

Plaintiff posed no risk to his children. SAC ¶¶ 46–48. The children's own therapist

recommended reunification therapy and increased visitation. SAC ¶ 49. The outcomes bore no

rational relationship to the evidence—which is precisely what one would expect from a process

that was "rigged." A "deliberate decision by a government official to deprive a person of [a

fundamental right] for no constitutionally adequate reason" violates substantive due process.

*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

As a matter of procedural due process, the fundamental unfairness of the proceedings—

confirmed by the GAL's admission, the judge's recusal, and the attorney's withdrawal—

deprived Plaintiff of the fair hearing to which the Constitution entitles him before the state may

infringe a fundamental right. See *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The argument

that Plaintiff received a "full opportunity for litigation" rings hollow when the GAL has admitted

the case was rigged, the judge has recused for impropriety, and the opposing party's own lawyer

has withdrawn. A "full opportunity for litigation" before a corrupt tribunal is not due process. It

is its antithesis.

The Court cannot accept Kryscio's conclusory assertion that the process was fair while

simultaneously being required to accept Plaintiff's well-pled allegations that it was not. At the

12(b)(6) stage, Plaintiff's allegations control—and they establish that the process was corrupted

from the inside.

### C. The Conspiracy Is Well-Pled Under Iqbal/Twombly.

Kryscio's most extensive argument is that the conspiracy allegations are "speculation and guesswork" lacking a "meeting of the minds" or "overt acts." Def.'s Mem. at 13–15. This argument requires the Court to ignore the specific factual allegations in the Second Amended Complaint, which it cannot do at this stage. *Iqbal*, 556 U.S. at 678.

To state a § 1983 conspiracy claim, a plaintiff must allege that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Plaintiff has pled both elements with specificity that far exceeds the plausibility threshold.

The "meeting of the minds" is established through both direct and circumstantial evidence.

*Direct evidence*: Atkins's February 28, 2026 admission that the case was "rigged against dad" is a direct statement by a coconspirator acknowledging the existence and purpose of the conspiracy. SAC ¶¶ 71–74. This admission was made in the presence of a witness, Heleille Soleille, and may be corroborated by surveillance footage from the Harris Teeter store where the encounter occurred—footage that Plaintiff has taken affirmative steps to preserve through a formal litigation hold notice served on the store on March 18, 2026. SAC ¶ 75. Kryscio dismisses this as merely showing Atkins's "own actions" rather than an agreement with Kryscio. Def.'s Mem. at 14. But this argument fails for two reasons. First, a reasonable inference from the admission that a case was "rigged" is that it was rigged by someone—that is, through a

coordinated effort among multiple actors. The use of the passive voice ("rigged against dad") implies a concerted scheme, not a unilateral act. At the 12(b)(6) stage, this inference must be drawn in Plaintiff's favor. Second, Atkins was not acting alone—he was a GAL whose recommendations required alignment with a party's positions, and that party was Kryscio. The pattern of Atkins's conduct—consistently favoring Kryscio's positions despite contrary evidence—provides the factual context for the "rigged" admission.

*Circumstantial evidence of coordinated action*: The following pattern of conduct, taken together, gives rise to a plausible inference of conspiratorial agreement:

- Atkins consistently aligned his GAL recommendations with Kryscio's litigation positions, despite evidence supporting Plaintiff's fitness as a parent. SAC ¶¶ 30–45.

- Atkins failed to investigate documents Plaintiff alleged were manufactured by Kryscio, declining to examine evidence that would have undermined Kryscio's position. SAC ¶¶ 35–40.

- Atkins recommended outcomes resulting in the near-total elimination of Plaintiff's parental contact, contrary to six independent psychological evaluations and the children's own therapist's recommendations. SAC ¶¶ 46–49.

- Kryscio obstructed even the minimal court-ordered visitation, beginning in May 2025 and continuing to the present, demonstrating a shared purpose with Atkins to eliminate Plaintiff from his children's lives. SAC ¶¶ 57–62.

- Plaintiff's own attorney, Katherine Meixel, withdrew on March 13, 2026—thirteen days after Atkins's admission—leaving Plaintiff without counsel at the precise moment the conspiracy was exposed. SAC ¶ 77.

- Judge Hoffman recused himself under Canon 1(D) for actual impropriety or the appearance thereof and vacated his own order, confirming the corruption of the proceedings. SAC ¶¶ 80–84.

- Atkins has five Virginia State Bar disciplinary actions, demonstrating a pattern of ethical violations consistent with the willingness to participate in the conspiracy alleged. SAC ¶¶ 25–29.

*Documentary evidence from Atkins's own GAL Report*: Beyond Plaintiff's well-pled allegations, Atkins's November 11, 2022 GAL Report provides contemporaneous documentary evidence of the disconnect between Atkins's stated advocacy and the outcomes he produced. In the report, Atkins insisted he "ALWAYS advocated" for Plaintiff's visitation and that he and Plaintiff's counsel "yielded, at each/every hearing, for some-time, MORE TIME for Mr. Burr with his children." Atkins's November 11, 2022 GAL Report. He confirmed that Plaintiff's home was appropriate and that Plaintiff's partner was "a positive and regulating influence." *Id.*

Yet the outcome of this purported advocacy was the near-total elimination of Plaintiff's contact with his children for 1,034 days. This is not "speculation and guesswork"—it is a documented, irreconcilable contradiction between Atkins's own words and the custody results, the most plausible explanation for which is the conspiracy Atkins himself later confirmed when he admitted the case was "rigged against dad."

Courts have long recognized that "direct evidence of a conspiratorial agreement is rarely available" and that conspiracy may be proven through circumstantial evidence and inferences drawn from parallel conduct. *Dykes v. Hosemann*, 743 F.2d 1488, 1497 (11th Cir. 1984). In *Dykes*—a custody conspiracy case directly analogous to this one—the Eleventh Circuit held that a conspiracy could be inferred from a pattern of coordinated conduct even without direct evidence of an express agreement. *Id.* The court explained that "[c]onspiracies are by their very nature clandestine," and that requiring direct proof of a conspiratorial agreement would "make their proof impossible." *Id.* Here, Plaintiff has both direct evidence (the "rigged" admission) and an extensive pattern of circumstantial evidence. The conspiracy is far more than adequately pled.

The overt acts are equally well-pled. Each of the above instances of coordinated conduct—Atkins's biased recommendations, Kryscio's visitation obstruction, and Atkins's admission—constitutes an overt act in furtherance of the conspiracy to deprive Plaintiff of his constitutional right to the care and custody of his children. See *Hinkle*, 81 F.3d at 421. In addition, Atkins's November 11, 2022 GAL Report contains further overt acts in furtherance of the conspiracy. Atkins's threat to lien Plaintiff's home—"I will own the 'Burr-Boys Beach-House'"—was a concrete act of financial intimidation designed to coerce and disadvantage

Plaintiff in the custody proceedings. Atkins's November 11, 2022 GAL Report. His prejudicial communications to the court diagnosing Plaintiff with "unpredictable-madness" and a "mental-breakdown/episode"—without any medical qualification to render such opinions and in direct contradiction of six professional evaluations—were acts calculated to poison the court's assessment of Plaintiff's fitness. Atkins's November 12, 2022 Follow-Up Email. These are not the neutral recommendations of a disinterested court officer; they are adversarial acts by a conspirator working to ensure that Plaintiff was deprived of his children. The *Hinkle* standard, which Kryscio herself cites, is satisfied. Kryscio's characterization of these allegations as "speculation and guesswork" ignores the factual specificity of the Second Amended Complaint and the documentary record, and asks this Court to weigh evidence at the pleading stage, which it cannot do.

## IV. PLAINTIFF STATES VALID CLAIMS UNDER 42 U.S.C. § 1985.

Kryscio argues that the § 1985 claims fail for the same reasons as the § 1983 claims—namely, insufficient allegations of conspiracy. Def.'s Mem. at 15–17. For the reasons set forth in Section III.C above, the conspiracy is well-pled. But the § 1985 claim stands on additional, independent grounds that Kryscio fails to address.

Section 1985(3) provides a cause of action against "two or more persons" who "conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). Critically, and unlike § 1983, § 1985(3) reaches purely private conspiracies—no state action is required. *Griffin v. Breckenridge*, 403

U.S. 88, 101–02 (1971). The Supreme Court in *Griffin* recognized that § 1985(3) was enacted to combat private conspiracies to deprive citizens of their constitutional rights, and that limiting the statute to state action would defeat its purpose. *Id.* at 101. This eliminates Kryscio's entire "not a state actor" defense as to the § 1985 claim.

To state a § 1985(3) claim, a plaintiff must allege: (1) a conspiracy; (2) motivated by racial or other class-based animus; (3) an act in furtherance of the conspiracy; and (4) a resulting injury to person or property or a deprivation of a right or privilege. *Griffin*, 403 U.S. at 102–03. Each element is satisfied here.

The conspiracy and overt acts are established as set forth in Section III.C above. The class-based animus requirement is met because Plaintiff alleges discrimination based on his status as a father and non-custodial parent. SAC ¶¶ 88–95. Courts have recognized that sex-based discrimination in custody proceedings may satisfy § 1985(3)'s class-based animus requirement. The systematic bias against Plaintiff as a father in this case—evidenced most powerfully by Atkins's admission that the case was "rigged against dad" (emphasis added)—demonstrates animus directed at Plaintiff because of his status as a father. The word "dad" in the admission is not incidental; it identifies the characteristic that made Plaintiff the target of the conspiracy.

The injury element is manifest. Plaintiff was deprived of his fundamental constitutional right to the care and custody of his children for nearly three years, and continues to be deprived of meaningful parental contact through Kryscio's ongoing obstruction. SAC ¶¶ 50–62.

Kryscio's reliance on *Simmons v. Poe*, *Brown v. Angelone*, and *Lewin v. Cooke* is unavailing. Those cases involved conclusory allegations of conspiracy without any factual support—no direct admissions, no corroborating witnesses, no judicial recusals confirming impropriety. Here, as demonstrated above, Plaintiff has pled specific, detailed facts supporting each element of the § 1985(3) claim, including a direct admission of rigging from a coconspirator, a corroborating witness, and extraordinary judicial action confirming that the proceedings were tainted. The § 1985 claim is well-pled and should survive the motion to dismiss.

## V. SNOW v. COUNTY OF HENRICO IS DISTINGUISHABLE AND DOES NOT SUPPORT DISMISSAL.

Kryscio places heavy reliance on *Snow v. County of Henrico*, 1990 WL 270198 (E.D. Va. 1990), as support for dismissal of the conspiracy claims. Def.'s Mem. at 14, 16. *Snow* is readily distinguishable and, far from supporting dismissal, highlights the strength of Plaintiff's claims by illustrating what an insufficient conspiracy pleading looks like.

In *Snow*, the court dismissed conspiracy claims because the plaintiff offered only "conclusory allegations" with "no discussion of meetings, conversations or correspondence which would suggest any agreement to deprive plaintiff of his constitutional rights." *Id.* at *3. The court specifically noted the absence of "any factual context for the alleged conspiracy." *Id.*

29

In other words, *Snow* was a case about no evidence—a plaintiff who alleged a conspiracy in name only, without any facts to support it.

This case is the opposite of *Snow*. Plaintiff does not offer conclusory allegations of conspiracy; he offers specific, corroborated, detailed factual allegations:

- A direct admission from GAL Atkins that the case was "rigged against dad"—a statement by a participant in the conspiracy acknowledging its existence. SAC ¶¶ 71–74.

- A corroborating witness (Heleille Soleille) who was present for the admission and can testify to its content. SAC ¶ 75.

- Potential surveillance footage from the Harris Teeter store corroborating the admission, which Plaintiff has taken steps to preserve through a formal litigation hold notice. SAC ¶ 75.

- A detailed pattern of coordinated conduct between Atkins and Kryscio spanning years, including aligned recommendations, failure to investigate manufactured documents, and outcomes contrary to all professional evaluations. SAC ¶¶ 30–62.

- The withdrawal of Kryscio's own attorney thirteen days after the conspiracy was revealed—an event entirely absent in *Snow*. SAC ¶ 77.

- A sitting judge's self-recusal under Canon 1(D) for actual impropriety—extraordinary judicial action confirming the corruption of the proceedings. SAC ¶¶ 80–84.

- Five Virginia State Bar disciplinary actions against the GAL, establishing a pattern of ethical violations. SAC ¶¶ 25–29.

- Atkins's own November 11, 2022 GAL Report—a contemporaneous document written by the alleged coconspirator himself—containing internal contradictions between his claimed advocacy and his recommendations, financial threats against Plaintiff, prejudicial pseudo-diagnoses of mental illness, and admissions regarding the scope of his state-delegated authority. Atkins's November 11, 2022 GAL Report.

Where *Snow* had nothing but conclusory allegations—no meetings, no conversations, no correspondence, no factual context—Plaintiff here has direct admissions, corroborating witnesses, a formal litigation hold on surveillance footage from the location of the admission, judicial action confirming impropriety, attorney withdrawal, a detailed pattern of coordinated conduct spanning years, and a contemporaneous written report by the alleged coconspirator that is riddled with contradictions, threats, and bias. If *Snow* represents the floor below which conspiracy allegations cannot fall, Plaintiff's allegations stand stories above it. *Snow* does not support dismissal; it supports denial of the motion.

Moreover, *Snow* is an unpublished district court opinion from 1990. It carries no precedential weight and predates both *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005), and the *Iqbal/Twombly* plausibility framework that now governs pleading standards. To the extent *Snow* articulates a standard for evaluating conspiracy pleadings, that standard has been refined by the Supreme Court and the Fourth Circuit in the intervening thirty-six years. The Court should apply the current *Iqbal/Twombly* plausibility standard—and under that standard, Plaintiff's conspiracy allegations are more than sufficient to survive a motion to dismiss. Kryscio's heavy reliance on *Snow* as her primary authority underscores the weakness of her position.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant Kryscio's Motion to Dismiss in its entirety.

The Second Amended Complaint alleges specific, detailed facts establishing a conspiracy to deprive Plaintiff of his fundamental constitutional right to the care and custody of his children. These allegations are supported by a direct admission from the court-appointed GAL that the case was "rigged," the subsequent withdrawal of Plaintiff's own counsel, the state court judge's self-recusal for actual impropriety and vacatur of his own order, Atkins's own GAL Report containing internal contradictions, financial threats, and prejudicial conduct, and a detailed pattern of coordinated conduct spanning years. These facts far exceed the plausibility standard required at the 12(b)(6) stage.

Kryscio's motion fails on every ground advanced. The Rooker-Feldman doctrine does not apply because Plaintiff challenges a corrupt process, not a state court judgment. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005); *Davani v. Va. DOT*, 434 F.3d 712 (4th Cir. 2006). The claims are timely under both the continuing violation doctrine and the discovery rule. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). The § 1983 claims are properly pled against a private coconspirator who acted jointly with a state actor. *Dennis v. Sparks*, 449 U.S. 24 (1980). The § 1985 claims reach purely private conspiracies and do not require state action. *Griffin v. Breckenridge*, 403 U.S. 88 (1971). And *Snow v. County of Henrico*—Kryscio's primary authority—is an unpublished, pre-*Iqbal* district court opinion that is distinguishable on its facts and, if anything, supports Plaintiff's position.

Defendant Kryscio's brief was filed two days after Judge Hoffman's recusal and makes no mention of it. It was filed two weeks after Kryscio's own attorney withdrew. It was filed less than a month after the GAL admitted the case was "rigged." These are not the hallmarks of a strong motion to dismiss. They are the hallmarks of a defendant attempting to secure dismissal before the full scope of the conspiracy is established through discovery.

The motion should be denied, and this case should proceed to discovery, where the full scope of the conspiracy can be established.

Respectfully submitted,

/s/ Brandon Aaron Burr

Brandon Aaron Burr, Pro Se

447 Eureka Loop

Newport News, VA 23601

Email: 2brandonb@gmail.com

Telephone: 9419628144

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of electronic filing to all counsel of record, including:

James A. Cales III

Furniss, Davis, Rashkind and Saunders, P.C.

Counsel for Defendant Kathryn Kryscio

/s/ Brandon Aaron Burr

34

Brandon Aaron Burr, Pro Se

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

BRANDON AARON BURR,
 Plaintiff,

v.                                                    Civil Action No. 4:26cv37

JASON ATKINS, individually,
KATHRYN KRYSCIO BURR, individually, and
MATTHEW W. HOFFMAN, individually,
 Defendants.

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL FOR MINOR CHILDREN

## I. INTRODUCTION

Federal Rule of Civil Procedure 17(c)(2) imposes a mandatory obligation on this Court: where a minor is unrepresented in a federal action, the Court "must appoint a guardian ad litem — or issue another appropriate order — to protect" that minor's interests. This motion invokes that obligation on behalf of two minor children — Luke Maxwell Burr (age 13, DOB February 5, 2013) and Zak Gabriel Burr (age 11, DOB March 26, 2015) — whose independent constitutional rights are directly at issue in this 42 U.S.C. §§ 1983 and 1985(3) civil rights action.

This is not a custody dispute, and this Court is not being asked to review, reverse, or modify any state court order. Plaintiff's claims are directed at the conduct of the Defendants — a court-appointed guardian ad litem, the children's mother, and a former presiding judge — who

1

are alleged to have conspired to corrupt the very proceedings intended to protect these children's welfare. The injury claimed arises from that conspiracy, not from the state court judgment itself. The children have independent constitutional interests in the integrity of proceedings affecting their familial associations — interests that cannot be adequately represented by their father, who is a named Plaintiff with his own claims, or by their mother, who is a named Defendant.

Under Rule 17(c)(2), the discretionary authority of 28 U.S.C. § 1915(e)(1), and the standards this Circuit established in *Whisenant v. Yuam*, 739 F.2d 160 (4th Cir. 1984), appointment of independent counsel is both mandatory and warranted. The children's own words, their formal complaints filed through independent institutional channels, and corroborating evidence from multiple independent sources demonstrate that their need for representation is genuine, urgent, and legally cognizable.

## II. FACTUAL BACKGROUND

### A. 1,034 Days Without Their Father.

From December 2021 through October 2024 — a period of 1,034 days — Luke and Zak had zero contact with their father. No visits. No telephone calls. No contact on birthdays or holidays. This severance occurred despite the fact that six independent licensed psychological evaluators examined Plaintiff and found him to pose no risk to his children. Not one evaluator recommended continued separation. The children's own therapist recommended reunification therapy and increased visitation. The custody outcomes bore no rational relationship to the evidence.

2

When minimal visitation was finally restored, the February 10, 2025 final order restricted Plaintiff to forty-five minutes per week of supervised contact. Beginning in May 2025, Defendant Kryscio began systematically obstructing even this minimal court-ordered contact, canceling sessions, arriving late, and manufacturing pretextual conflicts — conduct that continues to the present.

**B. The Children's Own Therapist Documented the Harm.**

The harm to Luke and Zak is not alleged by their father alone. It is documented in signed, locked therapy session notes from Laura Bronstein, LCSW — the therapist Defendant Kryscio herself selected for Luke. Those notes reflect that Luke told his therapist that his mother "tries to keep him from his dad" and "wants him to not see his Dad." Luke cried in therapy sessions. After inadvertently encountering his father in a store, Luke's behavior deteriorated so severely that he received disciplinary action at school — an event documented by Kryscio's own chosen therapist. These records are available for in camera review upon request.

**C. The Children Themselves Have Spoken.**

On March 28, 2026, Luke Maxwell Burr (age 13) and Zak Gabriel Burr (age 11) each filed formal complaints with the York County School Division Superintendent under Virginia Regulation 8VAC20-23-720. The complaints were submitted through Virginia's official educational complaint process — a formal institutional channel independent of any custody proceeding and inaccessible to Plaintiff as a mechanism for directing their content. They were written in the children's own words and signed in their own names. They are attached to the Motion as Exhibit A.

Luke wrote, in part:

> *"I should be allowed to have a relationship with my dad. Nobody asked me what I wanted. Nobody let me talk. . . . I even talked to a judge about seeing my dad. I went to the judge's office and told him what I wanted. But I still did not get to see my dad. And now that judge is gone because what he was doing was not right. So I told a judge how I felt and it did not matter. That is what it has been like for me."*

> *"I am asking that someone give me and my brother our own lawyer — someone who works for us. Not for mom. Not for dad. Not for the school. We deserve our own voice."*

Zak wrote, in part:

> *"I should be allowed to love my dad. I should be allowed to see him. I should be allowed to say I miss him without being scared. . . . I am scared to talk about this. My mom works at this school. She knows the people here. I do not want to get in trouble for saying this. I need to talk to someone my mom does not know. Someone who is not from this school. Someone safe."*

> *"I wish me and my brother could have our own lawyer. Someone who works for us. Not for mom. Not for dad. Not for the school. Just for us."*

Luke's complaint, authored at age 13, reflects age-appropriate specificity, first-person detail, and language consistent with the observations documented by his own therapist in locked session notes. Zak's complaint, authored at age 11, expresses fears — specifically, fear of

retaliation for speaking about his father in an environment controlled by his mother — that are independently corroborated by the therapy records. These are not legal arguments presented in a child's name; they are children's own accounts of their experiences, submitted to an institution with no stake in the parents' litigation, and consistent with observations made independently by licensed professionals.

**D. Multiple Independent Sources Corroborate the Corruption of the Proceedings.**

The allegation that the custody proceedings were corrupted does not rest on any single piece of evidence. It is supported by a constellation of independent sources:

First, the presiding state court judge, Matthew W. Hoffman, was recused on March 25, 2026, under Canon 1(D) of the Virginia Canons of Judicial Conduct — which addresses actual impropriety or its appearance. In connection with his recusal, Judge Hoffman vacated his own March 23, 2026 order. A sitting judge's voluntary self-recusal for actual impropriety is not a routine procedural event; it is an independent institutional acknowledgment that something went wrong.

Second, Defendant Jason Atkins served as court-appointed Guardian ad Litem for Luke and Zak throughout the underlying Newport News Circuit Court custody proceedings (Case Nos. CL1801756F-15; CL2301756H-01; CL2501756H-01). Atkins has been the subject of five Virginia State Bar disciplinary actions: reprimands in 2019 and 2022, and suspensions in 2024 and 2025. Four additional dockets are scheduled for hearing in April 2026. These are independent institutional proceedings reflecting a pattern of professional misconduct.

Third, Atkins's November 11, 2022 GAL Report — submitted to the court at 11:53 PM, self-described as a "Draft" — is itself evidence of bias. In that report, Atkins: (1) threatened to lien Plaintiff's home, writing "I will own the 'Burr-Boys Beach-House'"; (2) diagnosed Plaintiff with "unpredictable-madness" and a "mental-breakdown/episode" in a follow-up communication to the court on November 12, 2022, without any medical qualification; and (3) produced recommendations consistently aligned with Defendant Kryscio's positions, contrary to the findings of six independent evaluators.

Fourth, on February 28, 2026, Atkins approached Plaintiff at a Harris Teeter grocery store at 12404 Warwick Blvd, Newport News, Virginia. In the presence of a witness, Heleille Soleille, Atkins made an unprompted admission that the custody case had been "rigged against dad." Plaintiff served a formal litigation hold notice on Harris Teeter on March 18, 2026, preserving all interior and exterior surveillance footage from February 28, 2026. This admission is offered not as conclusive proof of conspiracy, but as corroborating evidence consistent with the pattern established by the independent institutional evidence described above. At the colorability stage, it supports a plausible, non-frivolous basis for the conspiracy claim.

Fifth, the children's own formal complaints — filed independently through the educational complaint process — provide a first-person account of the consequences of the alleged corruption, consistent with contemporaneous therapy records.

Taken together, these independent sources of evidence present a non-frivolous, colorable basis for the § 1983 and § 1985(3) claims.

.

**E. Luke and Zak Also Filed Formal Student Complaints with York County Schools.**

On March 28, 2026, Luke and Zak filed formal complaints with the York County School Division under Virginia Regulation 8VAC20-23-720. Their complaints detail the emotional harm they have suffered, describe the environment of fear in which they have been raised, and request that the school division take action to address their mother's conduct as a YCSD teacher. They also contain a formal FERPA request for access to their educational records. These materials are attached to the Motion as Exhibit A.

## F. A Note on Jurisdiction.

The claims presented in this action are not a collateral attack on the state court's custody orders. The Rooker-Feldman doctrine bars federal district courts from reviewing and rejecting state court judgments on the theory that those judgments were wrong. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). But where a plaintiff's injury arises from the defendants' conduct — not from the state court's ruling — the doctrine has no application. See *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006). The § 1983 and § 1985(3) claims here target the alleged conspiracy that corrupted the proceedings — the coordination between the GAL and a party, the biased recommendations contrary to independent evaluators' findings, and the presiding judge's conduct that led to his own recusal for actual impropriety. The injury is the conspiracy itself, not the resulting orders. A ruling in Plaintiff's favor would establish civil liability for the Defendants' conduct; it would not require this Court to declare the state court's orders void or unenforceable.

Younger abstention is equally inapplicable. The Supreme Court has confined Younger to three exceptional categories: ongoing state criminal prosecutions, certain civil enforcement proceedings, and civil proceedings uniquely in furtherance of the state courts' ability to perform their judicial functions. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78

7

(2013). None applies here. The February 10, 2025 final custody order is a concluded proceeding, not an ongoing one. This federal action does not seek to enjoin or interfere with any pending state proceeding; it seeks damages for completed constitutional violations.

The foregoing facts are presented not as proof of ultimate liability, but to demonstrate that the claims advanced in this action are genuine, non-frivolous, and legally cognizable — the threshold the Court must assess in determining whether Rule 17(c)(2) is triggered and whether exceptional circumstances warrant appointment of counsel under *Whisenant*.

## III. LEGAL STANDARD

Two independent legal authorities authorize — and in one case mandate — the appointment of counsel for the minor children.

Fed. R. Civ. P. 17(c)(2) is mandatory: "[t]he court must appoint a guardian ad litem — or issue another appropriate order — to protect a minor or incompetent person who is unrepresented in an action." (Emphasis added.) This is not discretionary. Where, as here, a minor has independent claims and is unrepresented, the Court's obligation to act is mandatory.

28 U.S.C. § 1915(e)(1) provides that "[t]he court may request an attorney to represent any person unable to afford counsel." The Fourth Circuit has identified four factors relevant to this determination: (1) whether the plaintiff's claim has merit; (2) the complexity of the legal issues; (3) the ability of the unrepresented party to present the case; and (4) whether the case will require investigation and expert witnesses. *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). All four factors weigh decisively in favor of appointment here.

While the Fourth Circuit has not addressed Rule 17(c)(2)'s application in this precise context, the Seventh Circuit's decision in *T.W. by Enk v. Brophy*, 124 F.3d 893, 895-96 (7th Cir. 1997), provides persuasive guidance consistent with Rule 17(c)(2)'s text and purpose, holding that Rule 17 protects minors' interests as a matter of procedural fairness, independent of financial considerations. The mandatory text of Rule 17(c)(2) — which this Circuit has not narrowed — supports the same conclusion.

Plaintiff acknowledges that Luke and Zak are not presently parties to this action and have not filed an application to proceed in forma pauperis. Rule 17(c)(2) does not condition the Court's obligation on the minor's status as a party — it requires the Court to protect any minor "who is unrepresented in an action" where that minor's interests are at stake. The children's independent constitutional interests are directly at issue in this proceeding regardless of their formal party status, and Rule 17(c)(2) provides the primary and independently sufficient basis for appointment. Section 1915(e)(1) provides a supplemental mechanism that would become operative upon the children's joinder as plaintiffs, and this Court's authority to appoint counsel in advance of formal joinder is consistent with the broad equitable powers inherent in the federal judiciary. See *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.").

## IV. ARGUMENT

### A. Rule 17(c)(2) Imposes a Mandatory, Affirmative Obligation on This Court.

Fed. R. Civ. P. 17(c)(2) provides: "The court must appoint a guardian ad litem — or issue another appropriate order — to protect a minor or incompetent person who is unrepresented in

an action." (Emphasis added.) The operative word is "must." This provision imposes an affirmative, mandatory obligation on the Court — it does not permit the Court to decline to act where an unrepresented minor has independent claims.

The Court's obligation under Rule 17(c)(2) is not contingent on the children's formal status as parties. The rule protects minors whose interests are "in an action" — a phrase that encompasses any minor with cognizable interests at stake in the proceeding, not merely those who have been formally joined. To read Rule 17(c)(2) as limited to existing parties would create an absurd result: minors who need representation the most — those who cannot initiate the procedural steps necessary to become parties — would be the very minors left unprotected. The rule is properly read as functional, not formalistic.

Luke and Zak Burr are minors. They have independent Fourteenth Amendment claims arising from this action. They are unrepresented. Their father is a named Plaintiff with his own claims and cannot adequately represent their independent interests. Their mother is a named Defendant. Under the plain text of Rule 17(c)(2), this Court must either appoint a guardian ad litem or issue another appropriate order to protect their interests. This Court's obligation is independently sufficient to grant the requested relief regardless of the § 1915(e)(1) analysis.

**B. Exceptional Circumstances Under 28 U.S.C. § 1915(e)(1) and *Whisenant*
Independently Support Appointment.**

Even if Rule 17(c)(2) did not compel appointment, the discretionary authority of § 1915(e)(1) and the *Whisenant* factors independently support it.

**1. The Minor Children Have Independent, Meritorious Constitutional Claims.**

The Supreme Court has recognized that the parent-child relationship is protected by a fundamental liberty interest under the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). While *Troxel* and *Santosky* addressed the parental side of this interest, a majority of federal circuits have recognized that this liberty interest runs in both directions — belonging independently to parent and child alike. See *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) ("The constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents."); *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002); *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988). Although the Fourth Circuit has not squarely addressed the issue, the weight of authority — and the logic of the familial liberty interest itself — supports recognition of the children's independent constitutional stake in their relationship with their father.

Luke and Zak Burr were deprived of any contact with their father for 1,034 consecutive days. This de facto termination of the parent-child relationship occurred without any finding of unfitness and contrary to the unanimous conclusions of six independent licensed evaluators. The near-total elimination of the children's relationship with their father, allegedly engineered through a corrupted GAL process, biased judicial proceedings, and systematic post-order obstruction, constitutes a direct violation of their protected liberty interest under the Fourteenth Amendment.

These claims are independent of their father's claims, though they arise from the same core facts. Luke and Zak are not derivative claimants. They are constitutional victims in their own right. They cannot, however, prosecute those claims. Under 28 U.S.C. § 1654, minor children may not appear pro se in federal court and must be represented by licensed counsel. *Myers v.*

*Loudoun Cty. Pub. Schs.*, 418 F.3d 395, 401 (4th Cir. 2005). Without appointed counsel, these children have no mechanism to vindicate their constitutional rights in this proceeding.

Defendants will likely raise immunity defenses. Defendant Atkins may assert quasi-judicial immunity, and Defendant Hoffman may assert absolute judicial immunity. These defenses do not defeat colorability at this stage. Quasi-judicial immunity protects the adjudicatory function — a GAL's in-court reports and testimony — but does not extend to out-of-court conspiratorial conduct or deliberate misrepresentations made for the purpose of corrupting the proceedings the GAL was appointed to assist. See *Butz v. Economou*, 438 U.S. 478 (1978). Even if Judge Hoffman ultimately prevails on absolute judicial immunity grounds — a question not before this Court on the present motion — that immunity does not insulate his alleged coconspirators from § 1983 liability. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). The § 1985(3) conspiracy claim survives regardless of the outcome of Hoffman's immunity defense.

The merit of these claims is demonstrated by objective, corroborated evidence already in the record: six evaluators who cleared Plaintiff, therapy notes documenting harm caused by separation, a sitting judge's self-recusal for actual impropriety, five VSB disciplinary actions against the GAL, the children's own independently filed institutional complaints, and the GAL's corroborating admission. The *Whisenant* merit factor weighs strongly in favor of appointment.

## 2. The Legal Issues Are Complex and Require Professional Navigation.

This case presents complex and overlapping questions of federal civil rights law. The Second Amended Complaint asserts five counts under 42 U.S.C. §§ 1983 and 1985(3), including

substantive and procedural due process claims, a multi-party conspiracy theory, class-based animus under § 1985(3), and a judicial misconduct count against Defendant Hoffman. The case involves contested doctrines including: state actor analysis under *West v. Atkins*, 487 U.S. 42 (1988); private coconspirator liability under *Dennis v. Sparks*, 449 U.S. 24 (1980); the Rooker-Feldman doctrine and its limitations under *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005); Younger abstention; the continuing violation doctrine; quasi-judicial immunity; and absolute judicial immunity.

The § 1985(3) conspiracy claim requires proof of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The Second Amended Complaint identifies the protected class as children subjected to custody proceedings who are denied access to a parent through judicial corruption — a class defined not by economic activity, cf. *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825 (1983), but by the systematic deprivation of a fundamental constitutional right. Whether this class satisfies *Griffin*'s "otherwise class-based" requirement is a merits question to be resolved on full briefing; at this stage, it is sufficient that the claim is non-frivolous and colorable.

Adding the minor children as plaintiffs introduces additional legal complexity: the scope of children's independent Fourteenth Amendment rights under *Troxel*; standing analysis for minor claimants; the procedural mechanism for adding minor plaintiffs through amendment under Fed. R. Civ. P. 15; and the appointment and supervisory role of a guardian ad litem or counsel under Rule 17. This is not a case a thirteen-year-old or an eleven-year-old can navigate.

**3. The Children Cannot Protect Their Own Interests — They Have Said So Themselves.**

The third *Whisenant* factor — the ability of the unrepresented party to present the case — is answered definitively by the children's own words. Luke is thirteen years old. Zak is eleven. They are minors. They are incapable of prosecuting federal civil rights litigation.

But beyond the obvious incapacity of minors to litigate, the record here reveals something more troubling: these children have been living in an environment in which they fear speaking their own minds. Luke described having to wait for his mother to leave the room before he could tell his therapist that he missed his father. Zak described being "scared" to speak at his school because his mother "knows the people here" and he "does not want to get in trouble." He specifically said he needs "someone safe" who his mother does not know.

A child who has been taught, through years of experience, that expressing love for a parent carries consequences cannot be expected to act as his own advocate in federal court. The children need independent counsel who works for them — not for their father, not for their mother, not for this Court's convenience. They have said exactly this in writing.

## C. The Question of Compensation Is Appropriately Left to This Court's Discretion.

Plaintiff does not seek to dictate the terms of any appointment or to resolve the question of attorney compensation at this stage. Plaintiff respectfully notes that:

- 42 U.S.C. § 1988 authorizes an award of attorney's fees to prevailing parties in § 1983 and § 1985(3) actions, and if the children's claims succeed, fee-shifting against Defendants is available;

- This Court retains broad inherent equitable authority to allocate the costs of appointed counsel as justice requires, including against parties whose conduct necessitated the appointment;

- The children's need for representation is independent of and should not be delayed by the question of fee allocation; and

- Plaintiff specifically does not ask the Court to order him to pay appointed counsel's fees at this time, but respectfully submits that the Court is in the best position to determine the appropriate arrangement once counsel is identified and the scope of representation is defined.

## D. The Exhibit A Packet Provides Direct Evidence of the Children's Need.

Exhibit A to the Motion is a thirty-two-page packet containing: (1) Luke Burr's formal student complaint to York County School Division Superintendent (March 28, 2026); (2) Zak Burr's formal student complaint to York County School Division Superintendent (March 28, 2026); (3) a formal FERPA request for both children's educational records; (4) a formal complaint regarding Defendant Kryscio's conduct as a YCSD teacher; and (5) an executive summary of the relevant facts.

Among the specific facts documented in the children's own complaints:

- Luke described a pattern of having to suppress his feelings about his father in his mother's presence, including in therapy sessions that his mother supervised.

- Luke described telling the presiding judge in chambers that he wanted to see his father, being ignored, and then watching that judge be removed for misconduct.

- Zak described living in fear of retaliation for speaking about his father, specifically because his mother is a teacher at his school and "knows the people here."

- Both children independently requested legal representation specifically described as working for them — not for either parent, not for the school — in nearly identical terms.

These facts establish that the children are not incapable of forming views about their situation — they are capable, and their views are clear. What they lack is a legal vehicle through which to assert them.

## V. CONCLUSION

Luke Maxwell Burr and Zak Gabriel Burr are minors with independent constitutional rights at issue in this proceeding. They did not choose this litigation and they cannot navigate it alone. Federal Rule of Civil Procedure 17(c)(2) exists for exactly this moment. The rule uses mandatory language: the Court must act to protect unrepresented minors with independent claims. Section 1915(e)(1) provides the mechanism for appointing counsel. The *Whisenant* factors — merit, complexity, inability to self-represent, and need for investigation — all point in the same direction.

Plaintiff respectfully requests that this Court:

1. Appoint independent counsel to represent the interests of Luke Maxwell Burr and Zak Gabriel Burr in this proceeding pursuant to Fed. R. Civ. P. 17(c)(2) and/or 28 U.S.C. § 1915(e)(1);

2. Authorize appointed counsel, in the exercise of professional judgment and following consultation with the children, to take such further procedural steps as counsel determines to be in the children's interests, including but not limited to moving to join the children as plaintiffs pursuant to Fed. R. Civ. P. 15 and 17; and

3. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Brandon Aaron Burr, Pro Se Plaintiff
447 Eureka Loop
Newport News, Virginia 23601
Telephone: (941) 962-8144
Email: 2brandonb@gmail.com

Date: March 29, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2026, I caused a true and correct copy of the foregoing Brief in Support of Plaintiff's Motion for Appointment of Counsel for Minor Children to be served upon the following by United States mail, first class, postage prepaid, and by electronic mail where counsel's email address is known:

Jason Atkins
Jones, Blechman, Woltz & Kelly, P.C.
701 Town Center Drive, Suite 800
Newport News, Virginia 23606

James A. Cales III
Furniss, Davis, Rashkind and Saunders, P.C.
Counsel for Defendant Kathryn Kryscio Burr

Matthew W. Hoffman
2500 Washington Avenue
Newport News, Virginia 23607

_____
Brandon Aaron Burr